YANKEE PUBLISHING INCORPORAT-
ED and International Licensing Man-
agement, Inc., Plaintiffs,

v.

NEWS AMERICA PUBLISHING
INCORPORATED,
Defendant.

No. 90 Civ 8120(PNL).

United States District Court,
S.D. New York.

Dec. 17, 1992.

Cowan, Liebowitz & Latman, New York City (William M. Borchard, Alasdair J. McMullan, of counsel), for plaintiffs.

Squadron, Ellenoff, Plesent & Lehrer, New York City (Slade R. Metcalf, Mark H. Jackson, of counsel), for defendant.

## OPINION AND ORDER

### Findings of Fact and Conclusions of Law

LEVAL, District Judge.

This is a suit for trademark infringement and false designation of origin in violation of Sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) & 1125(a), as well as unfair competition and unjust enrichment under New York state common law, and trademark dilution under New York General Business law § 368–d. The defendant acknowledges imitating prominent elements of plaintiffs' traditional magazine cover design but contends that it used plaintiffs' design for humorous commentary in a constitutionally protected manner, and that its use did not cause likelihood of confusion or other injury to plaintiffs'

mark, so that it is not liable under any of the theories of the complaint.

The parties agreed to submit the issue of liability for final judgment on the basis of a written trial record. The court's findings of fact and conclusions of law are set forth below.

*Background*

### Plaintiffs

Plaintiff Yankee Publishing Incorporated ("Yankee") has published *The Old Farmer's Almanac* (the *"Almanac"*) since 1941; the *Almanac* has been published annually since 1792. The *Almanac* is a venerable symbol of Americana. It contains folksy material of perennial interest including weather forecasts, astrological predictions, stories of fact and fancy, recipes, tide tables, timetables, and advertisements for homespun products. Representative articles in the 1991 edition [1] are "How To Have a Baby," offering practical folk tips on how to conceive,[2] select the sex of your child,[3] and ease labor pains;[4] "Turn Over, Dear, for God's Sake, Turn Over!," everything you always wanted to know about snoring;[5] "Praise the Lard and Pass the Pie Crust," an ode to the "forgotten shortening";[6] a guide to "Offbeat Museums,"[7] a "Gestation and Mating Table"; and pot pie recipes.[8] As a matter of policy, the *Almanac* rejects advertising for liquor and tobacco products. It runs ads for "Vitasex" tablets, which are guaranteed to "[i]mprove your desire and performance ... [a]nd win the desire of your mate regardless of age, or age differences"); and for "Sex–Alert" tablets, "the supplement that makes any relationship exciting again!" Yankee contends that the contents of the 1991 edition "reflect the traditional homey and folksy values the Almanac has come to represent over the years—*i.e.*, a slice of Americana."

The *Almanac* has an annual distribution of approximately five million copies, sold throughout the United States, primarily through newsstands, major bookstore chains, and mail order. Approximately four percent of the 1990 edition was distributed at newsstands in New York State (less than two-tenths of one percent in New York County).

Each year since 1852, the *Almanac* has featured the same cover design (the "Cover Design"). The *Almanac*'s Cover Design is registered with United States Patent and Trademark Office. It is beyond dispute that the Cover Design is a distinctive, widely recognized mark (or trade dress) that is widely associated with the *Almanac*.

The Cover Design has a yellow background framed by a red and white border. At the top of the frame is a red ellipse, framed in white, in which the edition is identified in white letters. The Cover Design is constructed around a bucolic motif; each corner of the cover features an agrarian seasonal vignette (farmers plowing the fields in spring, piling up hay in the summer, harvesting apples in the autumn, and milking cows in winter); ears of grain hang

---

1. All page references to the *Almanac* herein are to the 1991 Edition.

2. "If a woman lays her hat or coat on a strange bed, she will have a child." *Almanac* at 44.

3. "To have a boy, a woman should hold a nickel in her mouth at the time of conception." *Almanac* at 44.

4. "Labor pains can be eased by putting an axe under the bed." *Almanac* at 45.

5. "Twenty of the first 32 U.S. presidents were known to snore, including Washington, Lincoln, both Adamses, both Roosevelts, Taft, Hoover, and Grant. So were Mussolini (he was renowned), Hemingway, Lord Chesterfield, and even Beau Brummel, the ladies' man." *Almanac* at 114.

6. "Although as late as 1978 the National Live Stock and Meat Board in Chicago was promoting lard in its pamphlet 'Lard Makes it Better,' the trend since World War II in this country has been away from lard. Let's face it, lard became declasse." *Almanac* at 185.

7. Including the "Angora Goat Breeders Associations Museum," the "only museum in America devoted to goats," and the "Barbed Wire Museum," of La Crosse, Wisconsin, the "perfect spot for this off-the-beaten-path museum that extols the importance (and amazing designs) of barbed wire in our history." *Almanac* at 109–110.

8. "Pot pie will never be labeled as 'nouvelle cuisine.'" *Almanac* at 177.

from an ornate design framing the seasonal vignettes; and a variety of fruits, produce, grains and flowers are intertwined with the ornate design encircling the bold-faced title in the center of the cover. The title states: THE OLD FARMER'S 1991 ALMANAC BY ROBERT B. THOMAS." On either side of the title are two small portraits in oval frames—one of Benjamin Franklin, the other of Robert B. Thomas, the *Almanac*'s founder. Running along the left and right side of the cover are sentences running vertically up the page announcing "THE ORIGINAL ROBERT B. THOMAS *FARMER'S ALMANAC*, PUBLISHED EVERY YEAR SINCE 1792," and "ALSO FEATURING ASTRONOMICAL TABLES, TIDES, HOLIDAYS, ECLIPSES, ETC."

Co-plaintiff International Licensing Management, Inc. ("ILM") is the exclusive merchandise licensing agent for the *Almanac*'s trademark.[9] Currently, ILM has licensed variations of the trademark and Cover Design to over twenty licensees. ILM's licensees incorporate variations of the Cover Design, together with the *Almanac* trademark, in their products, or use variations on their packaging and labeling. The licensed products—including such items as gardening gloves, flower and vegetable seeds, garden hoses, decorative tins, ironing board covers, placemats, and hot breakfast cereals—are household products that have a natural affinity with the homespun image of the *Almanac*. The licensees' variations on the Cover Design retain many of its central design features—such as the mark "The Old Farmer's Almanac"—and its overall design spirit. Some of the licensees variations on the Cover Design encompass product-specific themes. For example, the seed packets use a flower-oriented adaptation of the Cover Design. Certain licensees use seasonal themes—including a Christmas theme featuring Santa Claus—in connection with their products. Three of the licensees of the *Almanac* are publications: a PAGE–A–DAY™ calendar, a large-print edition, and a "Best Of" book.

**Defendant**

Defendant News America Publishing Incorporated ("News America") is the publisher of *New York* magazine. *New York*, which has been published continuously since 1968, is a successful, stylish weekly magazine that reports on news, fashions, the arts, theatre and film, elegant merchandise, trends and tastes, concentrating on the City of New York. For the six months ended December 31, 1990, the average paid circulation of *New York* was approximately 436,110 copies. Over 72% of *New York*'s readership lives in the New York metropolitan area. *New York* includes such regular features as "HOT LINE—The Tops in Town This Week," a selection of videos, restaurants, music, theater, art, movies, tastings and books of the week; "BEST BETS," which is described as "The best of all possible things to buy, see and do in the best of all possible cities"; the "Intelligencer," a gossip column; and the CUE guide to "movies, theaters, art, music, dance, restaurants, children's events, nightlife, radio and television." *New York*, which is known for its coverage of the New York cultural scene, publishes reviews of restaurants, movies, television theater, dance, and music. *New York* publishes advertising for cigarettes and alcoholic beverages, as well as for upscale advertisers like Saks Fifth Avenue, Barneys New York, Bergdorf Goodman, Mercedes Benz, Yves Saint Laurent, Tiffany & Company, Charles Jourdan, Coach, Cole Haan, Absolut Vodka, and Chivas Regal.

*New York* has a distinctive logo and title consisting of its name in large bold semicursive distinctive type across the top one-quarter of the cover.

Every December since 1977, *New York* has published an annual Christmas gift issue featuring a variety of gift ideas. In the gift feature, photographs of the gifts are accompanied by prices and the names of retail shops where the item can be purchased in the New York area. The annual gift issue is not devoted exclusively to gifts. It contains the usual features of *New York* magazine; it is essentially a

---

**9.** For simplicity, this opinion frequently uses "Yankee" when referring to both plaintiffs.

conventional issue of *New York*, with one significant feature (and usually the cover) devoted to gifts. News America asserts that each year the gift issue is built around a theme by which gift ideas are presented in an imaginative artistic manner.

New York's 1990 Christmas Gift Issue

Robert Best, *New York*'s design director, and Edward Kosner, *New York*'s Editor and President, were responsible for selecting the cover and theme for the 1990 Christmas gift issue. In view of the slowing economy, and the passing of the self-indulgent, free-spending 1980s, they decided to point whimsically to "thrift," as a new social value. As Best explained in an affidavit, the thrift theme was intended to have satiric spin:

Of course, our use of the "thrift" theme was "tongue-in-cheek." Although some of the gifts we included in the [1990 Christmas issue] were inexpensive, none of them were the type of utilitarian, prosaic gifts that are typically associated with the meaning of the word "thrift." The gifts in the [1990 Christmas issue], as with the gifts in all our prior holiday issues, were stylish, sophisticated, attractive, and maybe even frivolous.

The whimsical turn toward thrift as a new social value for its readers was to be communicated through a joking reference to the *Old Farmer's Almanac*. The *Almanac* is associated with rusticity, thrift, homespun good sense, homely time-honored adages, practicality, permanence, and rejection of the new-fangled trendy changes—all values diammetrically opposite to the frivolous, trendy, inconstant, stylish, changeable, urbane glorification of consumption that characterizes the message of *New York*.

The joke, highlighting these opposites, was developed in the following fashion. The issue's cover was designed as an obvious takeoff on the famous traditional cover design of the *Almanac*, but with many changes. Among them, the *Almanac*'s title did not appear, and Mr. and Mrs. Santa Claus ("Saint Nicholas") were substituted in the side roundels for Ben Franklin and Almanac founder Robert B. Thomas, while

jolly Christmas scenes—most suggesting extravagance and consumption—were substituted for the *Almanac*'s dour images of farm work. All this was shown below the familiar name *New York*, set forth with the usual boldness, in its usual place, large size, and distinctive typeface. (*New York*'s cover and the 1991 *Almanac* cover are reproduced in the Appendix.)

Within the magazine, the section entitled "The 1990 Christmas Gifts Almanac" begins by focusing on thrift. It opens with a biblical quotation: "It is better to give than to receive." The first eight pages are devoted to lower-cost gifts for "$10 and under," "$25 and under," "$50 and under," and "$100 and under." Each of these categories is introduced by a thrift-honoring quotation—two of them from Ben Franklin (who is celebrated on the cover of the *Almanac*). The $10 page quotes Franklin, "A penny saved is a penny earned." On the $25 page, Cicero is quoted: "Men do not realize how great an income thrift is." The $50 page quotes Samuel Johnson, "A man who both spends and saves money is the happiest man, because he has both enjoyments." And the $100 page returns to Franklin for his virtuous exhortation, "Waste neither time nor money, but make the best use of both." Another page quotes a Scottish proverb, "He that has not silver in his purse should have silk on his tongue."

From there, the "save-spend" dilemma is elaborated by the display of gift suggestions that tend toward the frivolous. Notwithstanding the thrifty message of the first pages, prices thereafter escalate, and the theme of the mottos changes from thrift to extravagance and self-indulgence. One page quotes Oscar Wilde, "My tastes are very simple, I only want the best." Other pages offer: "Cooking is like love. It should be entered into with abandon or not at all." "When the average man says he loves greens, he is speaking of a golf course." "A gold rush is what happens when a line of chorus girls spot a man with a bankroll." Frivolous, expensive gifts and inexpensive, thrifty ones are placed side by side. A $15 pail of golf tees sits beside a

$150 silver golf pillbox. A wooden block globe puzzle of the world and its endangered species ($30) sits on a glamorous glass and galvanized steel globe table ($975).

Except for its cover and the introductory page of the Christmas gifts feature which repeats the cover, the issue of 252 pages includes no reference to the *Almanac*. The spine of the issue of *New York* reads simply "Christmas Gifts," "New York," "December 3, 1990."

Plaintiffs' Cause of Action

The complaint alleges that defendant's very recognizable takeoff on the pictorial elements of the *Almanac*'s well-known traditional cover design violates plaintiffs' trademark rights under federal and state law. The crux of trademark infringement is whether the unauthorized use "is likely to cause confusion, or to cause mistake, or to deceive...." 15 U.S.C. § 1114(1). Liability for trade dress infringement under Section 43(a) of the Lanham Act also hinges on proof of likelihood of confusion. *See* 15 U.S.C. § 1125(a); *Two Pesos, Inc. v. Taco Cabana, Inc.,* — U.S. —, —, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992). Similarly, under New York state unfair competition law the principal inquiry is whether the public is likely to be confused. *See Perfect Fit Industries, Inc. v. Acme Quilting Co.,* 618 F.2d 950, 953 (2d Cir. 1980). Plaintiffs contend that defendant's use of the Cover Design caused likely confusion in the marketplace, as well as dilution of the value of plaintiffs' trademark.

*New York* defends on two grounds:

First, it contends that its cover reference to the *Almanac* did not cause trademark confusion in the marketplace. Defendant contends it is obvious that *New York*'s imitation of the elements of the *Almanac*'s cover design is a joke or parody; that magazine consumers who see it would instantly recognize it as a joke; and would not be confused into believing that they were buying the *Almanac*, that the *Almanac* and *New York Magazine* had somehow joined forces, or that *New York* had become a licensee of the *Almanac*.

Second, defendant argues that, even if some marketplace confusion occurred, where the confusion arises from artistic expression, parody, comedy, or commentary of a type protected by the First Amendment, courts must balance the interest of free expression against the harm of marketplace confusion. Here, it argues that the constitutionally protected interest far outweighs any minor injury to plaintiffs' trademark rights.

I find for the defendant on both of these theories. The first question—likelihood of consumer confusion—is a close one. On first impression, *New York*'s cover is unquestionably similar to plaintiffs' Cover Design and is clearly suggestive of the *Almanac*. I find, however, that *New York* made it sufficiently clear that the obvious reference to the *Almanac* was a joke and that *New York* made clear its own identity by bold prominent display of its title, so as to dispel any substantial likelihood of real consumer confusion. Furthermore, even if there was some confusion as to source or origin, it was relatively minor and was far outweighed by First Amendment considerations protecting the right of commentary and artistic expression.

## *Discussion*

### A. Likelihood of Confusion

Plaintiffs contend that defendant's cover, incorporating substantial recognizable elements of the *Almanac*'s traditional Cover Design, caused substantial likelihood of confusion among consumers and violated their rights under federal and state trademark laws.

There is no doubt that the traditional cover design of the *Old Farmers Almanac* is a distinctive strong mark, used by plaintiffs in trade for many years, and that its unauthorized use by another in a manner likely to cause confusion would give rise to actions for trademark infringement, false designation of origin, and unfair competition.

It does not follow, however, that every unauthorized use of a protected mark is actionable. The trademark owner's rights are violated only where the un-

authorized use has a substantial capacity to mislead consumers (or other concerned actors in the marketplace) into a confusion as to the entity furnishing the goods or services. Mere unauthorized use does not by itself make out a cause of action; likelihood of confusion is also an essential element. *See* 15 U.S.C. §§ 1114(1), 1125(a); *see also Two Pesos*, —— U.S. at ——, 112 S.Ct. at 2758. If the context or manner of the use does not suggest that the trademark is being used to indicate source or origin of publication, there will be no consumer confusion. *See, e.g., Restatement (Third) of the Law, Unfair Competition* § 20 cmt. b, at 167 (Tent. Draft No. 2, 1990) ("if the use merely causes prospective purchasers to recognize the mark as a reference to the trademark owner, it is not an infringement").

■ While there is no doubt that *New York* published on its cover a recognizable imitation or caricature of the *Almanac's* trade dress, I find this was done in a manner that made it sufficiently clear to consumers that it was a joke and not a trademark source identifier. This use of the *Almanac's* trade dress therefore did not create a likelihood of misleading consumers as to the source of the magazine. Although it is clear that *New York's* cover *refers to* the *Old Farmer's Almanac*, the cover also makes sufficiently clear that it is *not* the *Old Farmer's Almanac*. Many factors contribute to preventing confusion. Most important is the title *New York*, presented in its very familiar logo and type style in large bold letters across the top quarter of the page. The magazine's spine clearly identifies it as "*New York*," without reference of any kind to the *Almanac* or its trade dress. The *Almanac's* title does not appear. It is quickly recognizable, furthermore, that the artwork is a joking deviation from the themes of the *Almanac*. In place of the familiar rustic scenes of farm life, with the portrait of thrifty Ben Franklin, there appear gaudily wrapped Christmas presents, an elegantly uniformed waiter serving dinner to a dog, and framed miniatures of Mr. and Mrs. Saint Nicholas. What the joke is designed to evoke is how different *New York* is from the *Old Farm-*

*er's Almanac*, and not the similarities between them.

The sizes of the publications are also different: The *Almanac* is a small 5½″ × 8″ booklet, with a hole punched through its upper left hand corner. *New York* is a larger format, 8″ × 10¾″. The two books make a distinctively different appearance. Even if the first glance at the cover were to cause momentary confusion, a further look into the magazine would dispel it. The title page, the masthead, and the familiar layout are easily recognizable as *New York*, and as very different from the *Old Farmer's Almanac*. Apart from the cover and the title page of the 34 page Christmas gift section, the remainder of the 252 page issue contains no reference to the *Almanac*. It is, otherwise, a conventional weekly issue of *New York*.

I conclude that *New York's* use of its caricature or takeoff on the *Almanac's* Cover Design is clearly recognizable as a joke and for that reason causes no significant likelihood of confusion concerning its source.

■ Plaintiffs urge the court to apply the eight factors set out in *Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), in order to ascertain likelihood of confusion. If the factors are examined with recognition that their purpose is to insure a broad examination of the central issue of whether consumer confusion is likely, they confirm the conclusion that *New York's* joke did not cause likely confusion.

(1) *Strength of Plaintiffs' Mark.* The first factor examines the strength of plaintiffs' mark. In the usual trademark infringement case, a strong mark is held to favor plaintiffs. Where the plaintiff's mark is being used as part of a jest or commentary, the opposite can be true. It is precisely because both plaintiffs' and defendant's marks are strong, well recognized, and clearly associated in the consumers' mind with a particular distinct ethic that confusion is avoided in this case. If the *Old Farmer's Almanac* were less well

known as a mark and were less well identified with a particular character and ethic, consumers might be more puzzled by the similarity. On the facts of this case, the consumer instantly recognizes, first, that the *Old Farmer's Almanac* is alluded to, but, second, that this is not the *Old Farmer's Almanac*. The consumer quickly recognizes that this, to the contrary, is *New York* making a joke about the fundamental differences between itself and the *Old Farmer's Almanac*. Thus the strength of the plaintiffs' mark, together with the strength of the defendant's mark, and the strong association of each with very different value systems, protects against consumer confusion by showing clearly that the imitation of the *Almanac* Cover Design is a joke and not an identifier of the source or origin of *New York* magazine. *See Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group, Inc.*, 886 F.2d 490, 495 (2d Cir.1989) ("ultimate test in trademark law" is "the likelihood of confusion ' "as to the source of the goods in question" ' ") (citations omitted). Behind the cover, the buyer would expect to find, and does find *New York* magazine.

(2) *Similarity of the Uses.* In a sense, *New York*'s use and the *Almanac*'s use are similar: Both are magazine covers. On closer examination, the uses are quite different. Plaintiff Yankee uses its traditional cover design as a source identifier, like a title, to reinforce recognition of its well-known magazine product. *New York* used the imitation of the *Almanac*'s Cover Design not as a source identifier, but as part of a jest; it invites readers to think about how different *New York* (and New Yorkers) are from the *Old Farmer's Almanac* (and its readers) and to speculate whether hard times ahead in the 1990s will make *New York*'s readers change their free-spending ways and become more like thrifty Yankee farmers. Because there is no likely confusion by reason of the consumer recognition that the allusion to the *Almanac* is a joke and not a source identifier, this factor is of little pertinence.

(3) *Proximity of the Products and (4) the Likelihood that the Prior Owner will Bridge the Gap.* Plaintiffs argue that the products, both being magazines, are in the same market and that there is no gap to be bridged. *See H. Lubovsky Inc. v. Esprit De Corp.*, 627 F.Supp. 483, 494 (S.D.N.Y. 1986). This is, however, too crude a characterization. In fact, the products are far apart. A magazine about deep sea fishing does not realistically compete with a literary review, notwithstanding that both are magazines. No more do the *Almanac* and *New York* vie for the same customers. Nor does the evidence suggest any likelihood that either will seek to bridge the gap.

The markets for *New York* and the *Almanac* are quite different. They discuss fundamentally different materials; they espouse different values; they sell primarily in different markets, both as to location and customer base. There is no indication in the record that purchasers of *New York* have any interest in buying the *Almanac* or vice versa. There is no apparent likelihood of Yankee focusing its sales efforts on *New York*'s readers or vice versa.

Thus, despite superficial appearance of proximity of products, the products are more realistically far apart and there is no apparent likelihood that either would seek to bridge the gap by aiming solicitation at the customers of the other.

(5) *Actual Confusion.* Yankee has presented virtually no evidence suggesting that any magazine purchasers were confused into incorrect assumptions about the source or sponsorship of *New York*'s Christmas Gift Issue. For the reasons expressed above, this is not surprising.

It is also a very significant deficiency, given that much time has passed since the publication of *New York*'s cover. Frequently, trademark litigation concerns the future use of a mark that is allegedly likely to cause consumer confusion. *See, e.g., Cliffs Notes*, 886 F.2d at 495–97. In such cases, evidence of actual consumer confusion is obviously difficult to present, as consumers have not yet had a chance to be confused. Here, in contrast, many months have passed since over 400,000 copies of the 1990 Christmas Gift Issue of *New York* were sent to newsstands and subscribers

and so fell into the hands of voluble magazine readers. If the *New York* cover were really confusing, one would expect to find magazine buyers who had been confused by it and had written or telephoned to either the *Almanac* or *New York* to complain or inquire. There is no such evidence. The total absence of evidence of any confusion among magazine purchasers is a strong indicator that the cover did not create a significant likelihood of confusion because *New York* was successful in conveying that the reference to the *Almanac* was a joke, and not a source identifier.

Yankee relies on evidence that some of its licensees, who use its trademark to sell other products, had raised questions whether the *New York* cover was authorized. The evidence offered is vague, and does not clearly show whether these inquiries were prompted by such persons having actually seen the *New York* cover, as opposed to having heard about it. If their inquiries resulted only from their having heard about the cover, they shed little light on the cover's capacity to cause confusion. In any event, this evidence is a minimal showing and fails to suggest that there was any significant likelihood of confusion among *consumers* as to the source or origin of *New York*, resulting from its use of the imitation of the *Almanac*'s Cover Design.

(6) *Defendant's Good or Bad Faith in Using Plaintiffs' Mark.* *New York* has made a strong showing that it used an imitation of Yankee's trademark cover in good faith as part of a joking commentary on the economic times, and not as an attempt to misuse or abuse Yankee's trademark rights. *New York* magazine would have absolutely nothing to gain from creating a confusion among readers causing them to believe that there was a business association between the *Old Farmer's Almanac* and *New York*. It was precisely the point of *New York*'s joke that the *Almanac* is a world apart from *New York* magazine. Thus, the intentional use by *New York* of an imitation of Yankee's trade dress was for the purpose of comic commentary, and not for any of the purposes that are forbidden or discouraged by the trademark law. There was no intention to create confusion or to free ride on the goodwill associated with Yankee's mark.

(7) *Quality of the Junior User's Product.* Yankee acknowledges the high quality of *New York* magazine.

(8) *Sophistication of Consumers.* The evidence suggests that magazine purchasers are sophisticated with respect to the magazines that they buy. This factor can be important because it bears on the likelihood that consumers may be confused by a similarity of appearance. The more sophisticated the consumers are with respect to the products in question, the less likely they are to be confused by a similarity.

Regular purchasers of *New York* are very familiar with its appearance, and regular purchasers of the *Old Farmer's Almanac* are very familiar with its appearance. Neither group was likely to be confused as to the source or origin of *New York*'s Christmas Gifts cover. The differences between *New York*'s cover and the true cover of the *Almanac* are substantial, clear, and noticeable to sophisticated consumers. It is accordingly most unlikely that consumers of the degree of sophistication that prevails among magazine purchasers would be misled into thinking that *New York* was now somehow associated with the *Old Farmer's Almanac*.

\*   \*   \*   \*   \*   \*

Upon review of the *Polaroid* factors, I remain convinced that *New York*'s cover did not cause a significant likelihood of confusion as to its source or origin.

## B.   First Amendment Protection

■ Even if there was some likelihood of confusion, I would still conclude that *New York*'s cover did not violate Yankee's trademark rights. This is because the First Amendment confers a measure of protection for the unauthorized use of trademarks when that use is a part of the expression of a communicative message.

■ Because the trademark law regulates the use of words, pictures, and other symbols, it can conflict with values protected by the First Amendment. The grant to

one person of the exclusive right to use a set of words or symbols in trade can collide with the free speech rights of others. When another's trademark (or a confusingly similar mark) is used without permission *for the purpose of source identification*, the trademark law generally prevails over the First Amendment. Free speech rights do not extend to labelling or advertising products in a manner that conflicts with the trademark rights of others. In these circumstances, the exclusive right guaranteed by the trademark law is generally superior to the general free speech rights of others. *See Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir.1989).

■ However, when unauthorized use of another's mark is part of a communicative message and not a source identifier, the First Amendment is implicated in opposition to the trademark right. In recognition of this potential conflict, the Second Circuit has construed the Lanham Act narrowly when the unauthorized use of the trademark is for the purpose of a communicative message, rather than identification of product origin. Thus, where the unauthorized use of a trademark is for expressive purposes of comedy, parody, allusion, criticism, news reporting, and commentary, the law requires a balancing of the rights of the trademark owner against the interests of free speech. *See id.*, 875 F.2d at 998; *Cliffs Notes*, 886 F.2d at 493–95.[10]

*Rogers v. Grimaldi* dealt with a Federico Fellini film entitled "Ginger and Fred," an obvious reference to the great Ginger Rogers and Fred Astaire, who danced glamorously together through Hollywood musicals of the 1930s and 1940s. In the 1980s, the famed Italian film director made a movie which "tells the story of two Italian cabaret performers, Pippo and Amelia, who, in their heyday, imitated Rogers and Astaire and became known in Italy as 'Ginger and Fred.'" *Id.*, 875 F.2d at 996–97.

Rogers brought suit under the Lanham Act. The Second Circuit stated:

> Titles, like the artistic works they identify, are of a hybrid nature, combining artistic expression and commercial promotion. The title of a movie may be both an integral element of the filmmaker's expression as well as a significant means of marketing the film to the public. The artistic and commercial elements of titles are inextricably intertwined. Filmmakers and authors frequently rely on wordplay, ambiguity, irony, and allusion in titling their works. Furthermore, their interest in freedom of artistic expression is shared by their audience. The subtleties of a title can enrich a reader's or a viewer's understanding of a work. Consumers of artistic works thus have a dual interest: They have an interest in not being misled and they also have an interest in enjoying the results of the author's freedom of expression. For all these reasons, the expressive element of the titles requires more protection than the labeling of ordinary commercial products.

*Id.*, 875 F.2d at 998 (footnote omitted). Accordingly, the Second Circuit adopted a balancing test for trademark infringement in cases implicating artistic expression to accommodate the dual interests of artistic expression and avoiding consumer confusion:

> [T]he [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression....
>
> This construction ... accommodates consumer and artistic interests. It insulates from restriction titles with at least minimal artistic relevance that are ambiguous or only implicitly misleading but leaves vulnerable to claims of deception titles that are explicitly misleading as to

---

10. The tentative draft of the *Restatement (Third) of the Law, Unfair Competition* adopts this standard, explaining that,

   many of these cases involve expressions of noncommercial speech entitled to broad constitutional protection, and it has been recog-

nized that in such circumstances courts should require substantially more evidence of confusion before imposing liability for infringement.

*Restatement* § 20 cmt. b, rep. note b, at 180 (citing *Cliffs Notes*).

source or content, or that have no artistic relevance at all.

*Id.*, 875 F.2d at 999 (footnote omitted).

Subsequently, the Second Circuit considered the balance between trademark and First Amendment interests where recognizable elements of a trademarked cover of a publication were used without authorization for parody. *Cliffs Notes*, 886 F.2d at 495. *Cliffs Notes* involved a parody of the popular Cliffs Notes study guides entitled "Spy Notes," created by *Spy* magazine in conjunction with a publishing company:

> The idea behind Spy Notes was to create a double parody. First, Spy Notes would poke fun at certain novels—Tama Janowitz's *Slaves of New York*, Brett Ellis's *Less Than Zero* and Jay McInerney's *Bright Lights, Big City*—which a Spy editor described ... as defining "a genre of savvy, urban novels depicting the drug abuse, promiscuity and post-adolescent angst of the 1980s." The editor further noted that "[b]ecause of their literary shortcomings and their familiarity to Spy readers, these novels were a natural target for Spy's satirical commentary." In addition, Spy Notes would satirize Cliffs Notes. Spy magazine editors thought that a study guide would provide an ideal vehicle for a parody of these works, because "[t]he flat, straightforward, academic style" of Cliffs Notes "would appear incongruous with the cool, ironic, sophisticated, urbane novels and thus greatly enhance the humor of the satire." Furthermore, "because most college graduates have seen or heard of" Cliffs Notes, the readers of Spy and the audience targeted for Spy Notes would be "familiar with the format and style" of Cliffs Notes.

*Cliffs Notes*, 886 F.2d at 492. As in this case, the defendant admitted that it copied prominent features of plaintiff's trademarked cover design, and contended that the copying was done for purposes of humor. *Spy Notes* thus replicated the distinctive yellow color, black diagonal stripes, and black lettering of *Cliffs Notes* trademarked cover. 886 F.2d at 492. The *Spy Notes* cover differed, however, in "some important" respects from the *Cliffs Notes* Cover:

> [T]he cover of Spy Notes, unlike that of Cliffs Notes prominently states "A Satire" five times in bright red lettering (and the back similarly states it four times), bears the notation "A Spy Book" with the logo of Spy magazine against a bright red background, uses the word "Spy" four times, and shows a clay sculpture of New York City rather than the clay sculpture of a mountain that typically appears on Cliffs Notes. Also, the cover of Spy Notes contains red, blue and white—colors that are not used on the cover of Cliffs Notes—and bears wry notations not found on a Cliffs Notes cover, such as "All Those Other Hip Urban Novels of the 1980s," and "Even Funnier Than the Originals." In addition, the Spy Notes cover price ($7.95) is substantially higher than that of Cliffs Notes ($3.50). Further, the cover of Spy Notes states prominently in red that it "Includes The Spy Novel–O–Matic Fiction–Writing Device!" This tool, which a prospective purchaser can inspect simply by opening Spy Notes, allows the "young, world-weary urban author" to create "16,765,056 different plot possibilities" by manipulating a card. A Cliffs Notes book contains no such obviously absurd shortcut to success. Finally, appellant plans to market Spy Notes in distinctive prepack of 10 copies in a manner that prominently features the Spy name.

*Cliffs Notes*, 886 F.2d at 492. In addition, the prepack in which the parody was to be marketed in most bookstores bore "the legend 'The outrageous Parody from the Creators of Separated at Birth' (the latter was a very popular book authored by Spy magazine editors)." *Id.*, 886 F.2d at 496.

In analyzing the Lanham Act claim against *Spy Notes*, the Second Circuit held that "the *Rogers* balancing approach is generally applicable to Lanham Act claims against works of artistic expression, a category that includes parody." Applying the *Rogers v. Grimaldi* balancing test, the Court found the *Spy Notes* parody raised only a slight risk of consumer confusion

that was outweighed by the public interest in free expression. *See Cliffs Notes*, 886 F.2d at 496.

■ In the present case, the defendant's use of a comic takeoff on the *Old Farmer's Almanac* cover is entitled to the protections explained by the Court of Appeals in *Rogers v. Grimaldi* and *Cliffs Notes*. Defendant's use of the Cover Design was artistic editorial expression. It was an attempt to make a joke that bad economic times in the 1990s might send the trendy, free-spending extravagance, epitomized by *New York* magazine and its readers, reeling toward the homely practical thriftiness of the world of the *Old Farmer's Almanac*. I find that the danger of public confusion as to source of origin resulting from the referential joke was slight at worst, and that the public interest in avoiding confusion was clearly outweighed by the public interest in free expression.

Yankee contends that News America's use of its mark did not constitute editorial expression of the sort that benefits from the protections of the First Amendment because (1) the *Almanac*'s Cover Design has no relevance to *New York* or to its Christmas Gift feature; (2) News America was not engaging in parody; (3) the alleged thrift theme, and the associated parody, were unrecognizable and hence invalid as protected expression; (4) the alleged parody was not labeled as such; and finally (5) the *New York* cover was inherently misleading and is therefore not entitled to First Amendment protection. I find that Yankee's arguments are not persuasive.

First, Yankee contends the *Almanac* Cover Design has no artistic or expressive relevance to *New York*'s Christmas Gift Issue. It contends this was nothing more than the unauthorized use of Yankee's valuable trade dress to help sell *New York*. Yankee contends that News America's "thrift" explanation is nothing more than a subsequent fabrication to disguise piracy. I reject Yankee's argument. I find no reason to doubt News America's good faith in its explanation of the intended significance of the joking reference to the *Old Farmer's Almanac*.

Yankee argues that the so-called "thrift" theme is not consistently pursued and is, indeed, at time, contradicted in *New York*'s gift piece. It argues, further, that the offered explanation of the reference to the *Almanac* is disingenuous because the *Almanac* is not synonymous with thrift.

The argument is not successful. It is undeniable that the thrift theme is present in the *New York* gift issue. Five mottos that cap the first nine pages of the gift feature all concentrate on thrift. The fact that aspects of the feature also contradict the thrift theme does not belie the existence of the thrift theme. *New York*'s message was complicated and involved the tension between opposite values. Yankee's assertion that the *Almanac* is not synonymous with thrift is also irrelevant. Whether rightly or wrongly, farmers, farm values, and the *Almanac* are associated by many with thrift. The fact that the *Almanac* does not expressly proclaim the value of thrift does not undermine the good faith of *New York*'s claim that its reference to the *Almanac* was intended to evoke the value of thrift.

Furthermore, Yankee's contention that *New York* was seeking to free ride on Yankee's goodwill simply makes no sense in these circumstances. The *Old Farmer's Almanac* and *New York* aim at completely different readerships and offer fundamentally different values. (That is indeed the point of the joke.) There is very little likelihood that *New York* could sell itself to Yankee's readership. What is more, if it tried, it would probably lose its own readership.

*New York*'s own mark is highly successful with a certain category of reader. Yankee's trademark is highly successful with a totally different category of reader. There is virtually no likelihood that *Old Farmer's Almanac*'s readership could be wooed successfully to *New York*. Nor is *Old Farmer Almanac*'s trademark successful among potential readers of *New York*. Yankee has offered no persuasive explanation of how *New York* could gain advantage by attempting to free ride on Yan-

kee's goodwill through a confusing imitation of Yankee's cover.

*New York* asserts that it was making a joke—a joke that furthermore focused on the chasm that separates it and its readership from the *Old Farmer's Almanac* and its readership. I find this explanation persuasive and reject Yankee's contention that the joke is an after-the-fact contrivance designed to camouflage a piracy of Yankee's goodwill.

Yankee's next arguments against giving *New York* the benefit of the more lenient First Amendment standard are that its cover was not a "parody," and that, if it was, it was unrecognizable as such. *New York* claims that its cover was a recognizable parody. I agree with Yankee that the Christmas cover was not a parody, but believe this makes no difference.

■ Parody implicates an element of ridicule, or at least mockery.[11] The *New York* cover does not ridicule or mock the *Almanac*. It rather makes a joking reference to the *Almanac*, as part of a socio-economic commentary, posing whimsically the question whether the trendy free-spending habits of *New York* and its readership will be converted by the disappearance of 1980s wealth and the arrival of 1990s penury into the likes of the *Almanac* and its thrifty readership. That is not parody.

But the dispute as to whether *New York*'s cover was parody misses the point. Yankee's argument implies that the special considerations emanating from the First Amendment depend on whether the allegedly infringing work is one of parody. That is not correct. Because unauthorized uses that provoke litigation, both in the copyright and in the trademark field, often involve parody, the decisions often discuss the special latitudes that are afforded to

parody. But parody is merely an *example* of the types of expressive content that are favored in fair use analysis under the copyright law and First Amendment deference under the trademark law. Indeed, of the two leading trademark cases that have explained that deference in the Second Circuit, while *Cliffs Notes* dealt with parody, *Rogers v. Grimaldi* did not. The message of these cases is not merely that *parody* is accorded First Amendment deference, but rather that the use of a trademark in the communication *of an expressive message* is accorded such deference. *New York*'s commentary on the times—that the reeling economy may be toppling *New York* from its glamorous free-spending perch toward the Yankee thrift characteristic of the *Almanac*—is an expressive message that is fully entitled to First Amendment deference, as much so as in the case of typical parody.

Yankee next argues that *New York*'s claimed evocation of thrift through reference to the *Almanac* is unrecognizable and incomprehensible—that observers of the *New York* "Almanac" cover simply could not understand the complicated message that defendant claims is intended. It argues that an uncommunicated message is no message at all, so that nothing is present but the confusing use of Yankee's trade dress.

Yankee seeks to differentiate this case from others that have accorded First Amendment protection on the grounds that it was evident in the others that parody was intended. In *Cliffs Notes*, the Second Circuit stated, "A parody must convey two simultaneous—and contradictory—messages; that it is the original but also that it is *not* the original and is instead a parody. To the extent that it does only the former but not the latter, it is not only a poor

11. Various dictionary definitions of parody are as follows: "A literary or artistic work that broadly mimics an author's characteristic style and holds it up to ridicule." The American Heritage Dictionary, Second College Edition (1982). "A composition in prose or verse in which the characteristic turns of thought and phrase in an author or class of authors are imitated in such a way as to make them appear ridiculous.... An imitation of a work more or less closely modelled on the original; but turned so as to produce a ridiculous effect." Oxford English Dictionary, Compact Edition (1971). "A writing in which the language and style of an author or work is closely imitated for comic effect or in ridicule often with certain peculiarities greatly heightened or exaggerated." Webster's Third New International Dictionary (1976).

parody but also vulnerable under trademark law, since the customer will be confused." 886 F.2d at 494 (emphasis in original); *see Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1486 (10th Cir.1987) ("An intent to parody is not an intent to confuse the public.") (parody of "Jordache" trademark on large-sized jeans bearing the mark "Lardashe" using an embroidered applique of a pig's head); *see also Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112 (2d Cir.1984) ("the fact that Donkey Kong [video game] so obviously parodies the King Kong theme strongly contributes to dispelling confusion on the part of consumers"); *Tetley, Inc. v. Topps Chewing Gum, Inc.*, 556 F.Supp. 785 (E.D.N.Y.1983) ("Petly Flea Bags" parody of "Tetley Tea Bags"); *Girl Scouts of United States v. Personality Posters Mfg. Co.*, 304 F.Supp. 1228 (S.D.N.Y.1969) (Girl Scouts' trademark on poster depicting a pregnant Girl Scout with the words "Be Prepared").

*New York* easily passes the test expressed in *Cliffs Notes*. The reference to the *Almanac* was clear, but it was also clear that this was *New York* magazine and not the *Almanac*—that the reference to the *Almanac* was humorous.

Yankee may well be correct in its surmise that many readers may have failed to understand the comic point intended by *New York* in its use of Yankee's trade dress. The joke is indeed quite complicated. It was clear *New York* was making a joke, but less clear exactly what the joke was.

In *Rogers v. Grimaldi*, the movie title "Ginger and Fred" was highly susceptible to consumer confusion. Many consumers may have assumed that the movie was in fact an authorized story of Ginger Rogers and Fred Astaire. Nothing about that title made it obvious that it was otherwise. The likelihood of confusion in *Rogers v. Grimaldi* was far greater than here for there were no visible signs accompanying the title to show consumers that the movie was

not in fact about Rogers and Astaire. Nonetheless the court found that the First Amendment interests prevailed. *See Rogers v. Grimaldi*, 875 F.2d at 1001 ("that risk of misunderstanding, not engendered by any overt claim in the title, is so outweighed by the interests in artistic expression as to preclude application of the Lanham Act").

Although *New York*'s position would probably be stronger if its joke had been clearer, the obscurity of its joke does not deprive it of First Amendment support. First Amendment protections do not apply only to those who speak clearly, whose jokes are funny, and whose parodies succeed. *Cf. Cliffs Notes*, 886 F.2d at 495–96.

The question remains one of balancing the importance of the free speech interest against the likelihood of confusion. In this case, in the view of this court, it is clear that the balance favors the defendant. In using a takeoff on the *Almanac*'s traditional cover *New York* was engaged in a genuine good faith effort to communicate a joking socio-economic commentary. The fact that joke was somewhat strained and complicated, and may not have been widely understood, does not detract from the First Amendment's protection for bona fide efforts to communicate. *New York* took care in its borrowing of the *Almanac*'s elements to avoid confusion by clearly showing that this was *New York* magazine and not the *Almanac*. *New York* was not attempting to advance itself commercially by free riding on the *Almanac*'s goodwill.

Yankee also argues by analogy to the Second Circuit's recent copyright decision in *Rogers v. Koons*, 960 F.2d 301 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992).[12] That case concerned a sculpture of puppies modelled after a copyrighted photograph. The Court of Appeals' asserted in *Koons* that there cannot be a parody if the object of the parody is unknown to the audience. Because parody derives its humorous message from a mocking imitation of a *known*

---

12. *But cf. Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 439, 104 S.Ct. 774, 787, 78 L.Ed.2d 574 (1984) (cautioning against analogies between copyright and trademark law in light of the "fundamental differences" between the two areas).

artistic style, if the mocked style is unknown, the audience will not recognize the mockery or see the humor; it thus cannot be parody. *See* 960 F.2d at 310.

Yankee's analogy to *Koons* fails. The point made by the Court of Appeals in *Koons* was not that the parody was unsuccessful, but rather that it was not a parody at all. It was not the Court of Appeals' message that a parody must succeed to gain protection. Rather, the Court rejected the *veracity* of Koons' contention that he was engaged in parody because "it is difficult to discern any parody of the photograph," the object of the claimed parody was completely unknown to Koons' audience, and there was evidence that the copying was done in bad faith. 960 F.2d at 310.

In *Koons,* the Court was essentially engaged in a finding of credibility. Here, Yankee asks this court to engage in literary criticism—judging how successful *New York*'s expressive message was. It is one thing to reject a First Amendment claim because the court disbelieves the claim that a communicative message was intended. It is quite another to reject a First Amendment claim because the court gives low marks to the success of the literary device. Courts are ill equipped to pass literary judgments. *Cf. Bleistein v. Donaldson Lithographing Co.,* 188 U.S. 239, 251, 23 S.Ct. 298, 300, 47 L.Ed. 460 (1903) (Holmes, J.) ("It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the work of pictorial illustrations"); *Pope v. Illinois,* 481 U.S. 497, 504–05, 107 S.Ct. 1918, 1923, 95 L.Ed.2d 439 (1987) (Scalia, J., concurring) ("impossible to come to an objective assessment of (at least) literary or artistic value"). Except in rare and extreme cases (such as those arising when a court *must* determine whether a work is obscenity or whether it has literary value, *see Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973)), courts should avoid as much as possible making the protections of the First Amendment turn on the courts' assessment of literary success.

In view of all these considerations, I conclude that the free speech interests protected by the First Amendment here far outweigh Yankee's interest in protecting its trademark from confusion that was unlikely to occur.

Next, plaintiffs argue that News America was under a duty to label its use as parody or joke. The basis for this contention is the following language from *Cliffs Notes:*

> By mentioning the items inside the book that would contribute to dispelling whatever risk of confusion might arise, we do not mean to suggest that a parody could copy the trademark aspects of the cover of a book without adequate indication on its own cover that it was a parody.

886 F.2d at 496 n. 5. The *Spy Notes* parody prominently stated "A Satire" five times in bright red lettering on the front cover (and four more times on the back cover). Moreover, the copyright notice page stated that "Spy Notes is a parody of Cliffs Notes." *New York* had no such legend on the cover. Its copyright notice page stated "Cover: Illustration by Gary Hallgren. Design inspired by the original Robert B. Thomas Farmer's Almanac." Yankee contends this does not dispel the notion that Yankee may have approved or licensed defendant's use. News America responds that the legend, "Design inspired by the original [*Almanac* ]"—dispels any notion of affiliation.

Yankee reads too much into the quotation from *Cliffs Notes.* There is no requirement that a parody identify itself by a label stating, "a parody." Such a legend can, of course, be helpful in avoiding confusion. If a defendant causes too much unnecessary confusion in using another's trademark, that confusion can tip the scales of the balancing test in the plaintiff's favor. But a "parody" label is not required. The title "Ginger and Fred" at issue in *Rogers v. Grimaldi* had no accompanying subtitle to dispel the notion that this was authorized by the real Ginger and Fred; nonetheless the court found the First Amendment applicable, and in circumstances far more likely to cause confusion than are present here.

Finally, Yankee argues that *New York*'s cover was inherently misleading and therefore not entitled to First Amendment protection as suggested in the *Rogers v. Grimaldi* opinion. *See* 875 F.2d at 999, n. 5. I find no basis for this argument. The takeoff was neither intended to mislead nor, in the court's view, did it mislead.

Dilution

■ New York's anti-dilution statute, General Business Law § 368–d provides:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

The elements of a cause of action under this statute and the factors to be considered have been discussed in a number of cases. While dilution, even without confusion, can sustain a cause of action under the New York statute, the factors are, on the whole, quite similar to those involved in a federal cause of action under the Lanham Act. *See, e.g., Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625–26 (2d Cir. 1983); *Miss Universe, Inc. v. Patricelli*, 753 F.2d 235, 238 (2d Cir.1985); *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977); *Hester Industries, Inc. v. Tyson Foods, Inc.*, 16 U.S.P.Q.2d 1275, 1278 (N.D.N.Y.1990). For the reasons discussed at length above, I conclude that Yankee has not suffered dilution, watering down, or weakening of its mark resulting from *New York*'s cover. *See Conan Properties Inc. v. Mattel Inc.*,

712 F.Supp. 353, 362–63 (S.D.N.Y.1989) (dismissal of Lanham Act claim for failure to demonstrate likelihood of confusion warranted dismissal of common law unfair competition claim as well); *see also* Robert C. Denicola, "Trademarks as Speech: Constitutional Implications of the Emerging Rationales for the Protection of Trade Symbols," 1982 *Wis.L.Rev.* 158, 188 ("the use of famous marks in parodies causes no loss of distinctiveness, since the success of the use depends upon the continued association of the mark with the plaintiff") (footnote omitted). In any event, the same First Amendment considerations that limit a cause of action under the Lanham Act apply also to a cause of action under New York law.[13]

Unjust Enrichment

■ To prevail on a claim of unjust enrichment, plaintiffs must show that the defendant has been enriched at plaintiffs' expense "under such circumstances that in equity and good conscience he ought not retain." *Miller v. Schloss*, 218 N.Y. 400, 113 N.E. 337 (1916). Yankee has failed to show that *New York* reaped any unjust enrichment.

## Conclusion

Plaintiffs have failed to show that defendant's use of a recognizable imitation of plaintiffs' trade dress caused any significant likelihood of confusion. In any event, defendant's right of free speech in the exercise of comic commentary outweighs any minor injury that may have been caused to plaintiffs' trademark rights.

Judgment shall be entered for the defendant.

SO ORDERED.

---

**13.** I note furthermore that the language of § 368–d provides for only injunctive relief. Because the alleged dilution is not ongoing, injunctive relief is now moot.