**NEW YORK STOCK EXCHANGE, INC., Plaintiff,**

v.

**David GAHARY and John Zito, Defendants.**

No. 00 Civ. 5764(RLC).

United States District Court, S.D. New York.

April 8, 2002.

Baker Botts LLP (Richard S. Last, Neil P. Sirota, of counsel), New York City, for Plaintiff.

Agnes C. McKeon (Agnes C. McKeon, of counsel), New York City, for Defendant.

## OPINION

ROBERT L. CARTER, District Judge.

Plaintiff New York Stock Exchange moves for summary judgment on its claims that defendants David Gahary and John Zito have used variations of the name "Richard Grasso," without plaintiff's permission, to post offensive messages to certain internet bulletin boards, in violation of Section 43(a) of the Lanham Act,[1] New York State's General Business Law Sections 349 and 350, and New York common law. Plaintiff also moves, pursuant to Rule 12(c), Fed.R.Civ.P., for judgment on the pleadings with respect to counterclaims brought by defendants for harassment and abuse of process. Defendants oppose both motions and bring their own motion for summary judgment on grounds that their use of the Grasso name is parody protected by the First Amendment, and that defendant Zito never posted any messages under any variation of the Grasso name. For the reasons set forth below, both parties' motions for summary judgment are denied. However, plaintiff's motion for judgment on the pleadings regarding defendants' counterclaims is granted.

## BACKGROUND

The parties disagree on much to do with this case. What is undisputed is that, in or about August 1999, defendant David Gahary ("Gahary") began posting messages to certain internet bulletin boards hosted by the website RagingBull.com.[2] (Gahary Tr. 97–99.) The RagingBull.com website is home to a number of such on-line forums, which are devoted to discussion of a wide variety of issues. (*Id.* at 89–90.) As the name RagingBull.com suggests, however, the site's primary focus is on financial subjects, such as the stock market. (*Id.* at 89.) The typical stock-related bulletin board on RagingBull.com is ostensibly organized around discussion of a specific stock, such as Biocontrol Technology (BICO),[3] Cyber–Care (CYBR), or Environmental Solutions Worldwide (ESWW). In practice, however, the dialogue seems to range well beyond that, routinely encompassing talk of financial matters and the stock market generally. (Gahary Tr. 90–91.) Participants post messages under "screen names" (essentially, on-line aliases) that they choose for themselves.[4] For his screen names, Gahary chose several variations of the name "Richard Grasso," who has been the Chairman and Chief Executive Officer of the New York Stock Exchange ("the Exchange" or "NYSE") since 1995. This choice was no mere coincidence: Gahary concedes that he consciously sought to evoke the name and identity of Richard Grasso, C.E.O. of NYSE. (Gahary Tr. 94–95, 163, 164.)

Gahary posted most of the messages at issue in this case using one of five similar screen names: "dickgrasso," "DickGras-

---

**1.** 15 U.S.C. § 1125(a)(1)(A).

**2.** http://www.ragingbull.com.

**3.** Now known as "BIKO".

**4.** Before users can post messages to the bulletin boards on RagingBull.com, they must first set up an account with the site. As part of this process, each user chooses a distinctive screen name that then becomes identified with the account he has established. (Gahary Tr. 94.)

so," "richardgrasso," "RichAGrasso," and "Grasso2." (Gahary Decl. ¶ 5.) It further appears, though the record is not completely clear on this point, that he did not mean to use the aforementioned aliases contemporaneously. Rather, when one name would be "TOS'ed" (or deleted) by administrators at RagingBull.com,[5] Gahary would simply create a related but distinct alias and resume posting messages. *Defs.' Opp'n Mem.* at 4 n. 8. In this way, he was able to maintain the continuity of his on-line identity. *Id.* Eventually, however, the five aforementioned screen names were all TOS'ed, and Gahary found himself unable to create new ones.[6] Eager to continue posting, he turned to defendant John Zito ("Zito"), whom he had met while posting to certain RagingBull.com bulletin boards under the alias "richardgrasso." (Zito Decl. ¶ 5.) On or about July 24, 2000, Zito secured three new screen names at Gahary's request—"richardgrasso 3," "richardgrasso4," and "RichieGrass"—bringing the total number of Grasso aliases to eight. (Zito Answer and Countercls. ¶ 17.) While Zito does not deny that he created these names for Gahary, he insists (and nothing on the record contradicts his claim) that he never personally posted any messages using them.[7] (*Id.*) Whatever reprieve Zito's efforts may have earned Gahary, however,

was apparently short-lived. The latter's final post, using any of the eight aforementioned screen names, was recorded only a few days later, on or about July 27, 2000.[8] (Compl., Exs.1A–4Q.)

Gahary concedes the controversial character of the messages he posted using the eight Grasso aliases. He freely admits that his comments were frequently rude, crude, and demeaning:

> Grasso [the on-line persona] is very confrontational. He was abusive. He was hopefully obscene, harassing, definitely—he was not unlawful. He was not harmful. But you can't harm anybody. He did not invade anyone's privacy. Tortious, I don't know. He was hopefully very objectionable.

(Gahary Tr. 113.) A representative rant confirms this depiction:

> sellnow: no, the U235 is actually from merlin olsen's rectum: seems that stan cottrell got a little close to that area recently and developed testicular cancer hence the discovery of olsen's radioactive poop chute. I know it sounds weird, but it's right up Bico's alley, wouldn't you agree?

Gahary's tirades were even, on occasion, explicitly vulgar:

> to all you new fuckkin fools:

---

**5.** T–O–S. is an acronym for "terms of service." To be TOS'ed is to have one's account with RagingBull.com terminated for violating the website's terms of service. (Gahary Tr. 168–69.) The practical effect is to end one's ability to post under a particular screen name.

**6.** Like many websites with on-line discussion groups, RagingBull.com requires users to register an active e-mail address to qualify for an account and screen name. Users cannot use the same e-mail address to set up more than one account. At some point, Gahary simply ran out of e-mail addresses—his internet service provider offered him only a limited number—to use for new accounts and screen names. (Gahary Tr. 106, 167.)

**7.** In fact, the only person besides Gahary to post under a Grasso alias was Michael Watson ("Watson"), who used the screen name "grassodick." However, Watson appears simply to have been a copycat, with no real connection to Gahary. (Gahary Tr. 193.) His posts and use of the Grasso name are no longer at issue in this suit.

**8.** Gahary did identify himself as richardgrosso in the body of several subsequent messages. However, these messages were posted under a completely unrelated screen name. And Gahary insists that he referenced richardgrosso simply so his friends on RagingBull.com could recognize him. (Gahary Tr. 99.)

you will all be crushed soon by bico's mm's simply b/c you are here, don't even think about insulting sell now, sell low, 2centsin, big fish, and a few others. they forgot more than you know or will ever know about this stock, that will certainly separate you from your § . just shut the fuckk up and watch, and then come back humbly and share in the successful stock tips some of these good men freely hand out.

(Compl., Ex. 4A.) Indeed, Gahary seems to have reveled in the disconcerting effect his abrasive on-line persona had on others. In his final message posted using any of the eight Grasso screen names, Gahary laments: "Honestly, you guys are so much fun to rattle, or at least you were." (Compl., Ex. 3Q.)

Understandably alarmed by the unauthorized use of the Grasso name in such a deliberately offensive manner, the Exchange filed suit, on August 3, 2000, seeking unspecified damages and an injunction against any further such posts using any variations of the Grasso name. (Compl. ¶ 1.A.) Initially, since the Exchange did not yet know either the identities of the posters or how many there were, the complaint simply named "John Doe Nos. 1–10" as defendants. On November 20, 2000, however, the Exchange filed an amended complaint explicitly naming David Gahary, John Zito, and Michael Watson as defendants. On December 20, 2000, Gahary answered the complaint and interposed counterclaims against the Exchange for harassment and abuse of process. Shortly thereafter, on December 28, 2000, Watson entered into a "Stipulated Consent Judgment" with the court, leaving only Gahary and Zito as defendants. On January 23, 2001, Zito also answered the complaint and interposed counterclaims identical to Gahary's. The parties pursued

discovery for several months thereafter; then, on October 2, 2001, the Exchange moved for summary judgment on all counts of the complaint, and for judgment on the pleadings with respect to defendants' counterclaims. Defendants opposed and, on November 1, 2001, cross-moved for summary judgment, bringing events to where they now stand.

## DISCUSSION

### Summary Judgment

Under Rule 56(c), F.R. Civ. P., summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." The moving party "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir.1995). In ruling on the motion, the court must "resolve all ambiguities and draw all reasonable inferences against the moving party." *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 83 (2d Cir.2001). If the moving party discharges its burden of demonstrating the absence of a genuine issue of material fact, the onus shifts to the nonmoving party to show that a genuine issue exists for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To satisfy its obligation, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Moreover, in making the requisite showing, the nonmoving party may not "rely on mere speculation or conjecture...." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986).[9]

---

9. This case, of course, involves cross-motions for summary judgment, making the analysis

marginally more complex in that all parties

Moving from the procedural to the substantive, one point merits clarification at the outset. As specified previously, the Exchange advances distinct state and federal causes of action. However, the parties seem to agree that the central factual inquiries remain much the same across the various legal claims. There are a few important contrasts: most notably, a party must demonstrate that an unregistered mark like the Grasso name has acquired "secondary meaning" to enjoy protection under the Lanham Act, *see, e.g., Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992), whereas no such showing is necessary to prevail on a New York state common law claim for unfair competition. *See, e.g., Coach Leatherware v. AnnTaylor, Inc.*, 933 F.2d 162 (2d Cir.1991). But the differences are slight, and defendants' defense that Gahary's use of the Grasso name was protected by the First Amendment would, if successful, trump plaintiff's state and federal claims equally. *Yankee Publ'g, Inc. v. News America Publishing Inc.*, 809 F.Supp. 267 (S.D.N.Y.1992) (Leval, J.). For simplicity's sake, therefore, the court will follow the parties' lead and discuss the factual disputes primarily within the framework this Circuit has established for assessing claims of unfair competition under the Lanham Act.

*Gahary's Intent*

The Exchange argues that, because Gahary has conceded he intended to appropriate the "Richard Grasso" name and evoke the identity associated with it, this evidences a bad faith "intent to trade on the goodwill of that name." *Pl.'s Reply Mem.* at 3. The Exchange is right in one

sense, but wrong in a more important one. When Company A appropriates name and identity of Company B in the ordinary commercial context, it is reasonable to assume that the former is acting deceptively in an attempt to free ride illegitimately on the business success of the latter. Defendants, however, insist that Gahary was engaged not in deception but parody. (Gahary Tr. 108–09.) And applying such a blanket presumption in the context of parody makes no sense.

Virtually all parody "depends upon association with the original"—otherwise the parody would be incomprehensible. *New York Stock Exch., Inc. v. New York, New York Hotel, L.L.C.*, 69 F.Supp.2d 479, 487 (S.D.N.Y.1999) (Cederbaum, J.). To presume bad faith on the part of every parodist would be both unfair and inefficient. The critical question, in this context, is whether the parody, in addition to referencing the original, simultaneously conveys the contradictory message "that it is not the original." *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group, Inc.*, 886 F.2d 490, 494 (2d Cir.1989). *See also Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 503 (2d Cir.1996). And here, both the sheer outrageousness of Gahary's messages, as well as the particular place he chose to post them, paradoxically bolster defendants' claim that Gahary's intention could not have been to impersonate Grasso.

Defendants argue that "no one in their right mind" would believe that so well respected a member of the financial establishment as Grasso would be posting messages on RagingBull.com. (Gahary Tr. 109.) This contention is entirely plausible

are both moving and nonmoving parties simultaneously. As suggested above, the court finds that, though both sides have provided sufficient evidence to survive summary judgment, neither has offered enough to justify award of the same. Rather than review the

record twice, however, this opinion analyzes the case primarily as a motion for summary judgment by plaintiff, drawing all inferences and resolving all ambiguities in favor of defendants.

given the often inane and profane substance of Gahary's posts. Take, for example, the way Gahary would sometimes "hype" or "bash"[10] certain stocks on the RagingBull.com message boards:

> Chpt 11: yeah, INANE meenie still breathes, unfortunately. what a friggin loser. good to be back as grasso. GO-OOOOOO BICOOOOOOOO!!!!!!!
> (Compl., Ex. 3G.)

> \* \* \* \* \* \*

> pzgen: good to see you! heck, i wish i could help you understand. i'm still trying to understand myself! hey, why do i keep getting the boot?! GOOOOOO ESWWWWWWWW!!!!!!!
> (Compl., Ex. 3P.)

If Gahary were trying to impersonate Grasso, this would hardly be the way to do it. The notion that the real Richard Grasso, Chairman and CEO of one of the world's preeminent stock exchanges, would offer such investing "advice" so casually—or callously—verges on the unbelievable. Indeed, as the Exchange points out in its own papers, "the real Richard Grasso does not make investment recommendations which would be inconsistent with his role as Chairman [of the Exchange]." *Pl.'s Mem.* at 10 n. 8. This extreme incongruity between Grasso's prestigious public persona and Gahary's absurd posts on obscure internet stock boards is precisely the "twist" the latter claims he wanted to exploit for humorous effect. (Gahary Tr. 114–15.)

■ Gahary was, as he concedes, unsuccessful in his endeavor. (*Id.* at 108–09.) Contrary to the Exchange's suggestion, however, this does not a mean that he has therefore admitted that there was no parody, or that he acted in bad faith. *Pl.'s*

*Reply Br.* at 4. Gahary insists that the reason his parody failed was that nobody knew who Richard Grasso was. (Gahary Tr. 134–35.) This issue is discussed in greater detail below, but once the reader is aware of who Richard Grasso is, the contradictory messages characteristic of parody do seem to be present. Just to be clear, of course, defendants have not conclusively established that Gahary acted purely out of a good faith desire to parody. The Exchange is free to offer evidence at trial that Gahary's intent was, in fact, to deceive readers of his posts into thinking they were actually authored by Richard Grasso.[11] What the Exchange has not done is meet its heavy burden of demonstrating that there is no genuine issue regarding this disputed fact. *See New York Stock Exch., Inc.*, 69 F.Supp.2d at 484 ("Issues of good faith are generally ill suited for disposition on summary judgment."). This conclusion is all the more inescapable when all ambiguities are resolved, and all inferences drawn, in favor of defendants.

*Secondary Meaning*

At the heart of this dispute is the Exchange's attempt to claim trademark protection for the unregistered name of its Chairman and CEO, Richard Grasso. The Second Circuit has stated that, "[f]or purpose of trademark analysis, personal names—both surnames and first names— are generally regarded as descriptive terms which require proof of secondary meaning." *815 Tonawanda St. Corp. v. Fay's Drug Co., Inc.*, 842 F.2d 643, 648 (2d Cir.1988); *see also Yarmuth–Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 993 (2d Cir.1987); *Madrigal Audio Laboratories,*

---

10. I.e., mindlessly promote or disparage.

11. Of course, the Exchange is advised to offer something more substantial than scandalous allegations of Gahary's involvement with vari-

ous shady enterprises and individuals. *See Pl.'s Mem.* at 6–8. Such evidence, while not wholly irrelevant, is, at best, only marginally related to the question of Gahary's intent in the case at bar.

*Inc. v. Cello, Ltd.,* 799 F.2d 814, 822 (2d Cir.1986); *Abraham Zion Corp. v. Lebow,* 761 F.2d 93, 104 (2d Cir.1985). Secondary meaning refers to "the power of a name or other configuration to symbolize a particular business, product or company." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 203 n. 5 (2d Cir.1979). The focus here is on the level of recognition among relevant consumers. *Centaur Communications Ltd.,* 830 F.2d at 1221.

The Exchange offers two main reasons why it has met its burden of proving a secondary meaning associated with the Grasso name. First, the Exchange argues that Gahary's very decision to intentionally copy the name Richard Grasso as part of his parody constitutes prime facie proof that the name has attained secondary meaning. *Pl.'s Reply Mem.* at 4 (citing *Centaur Communications v. A/S/M Communications,* 830 F.2d 1217, 1224 (2d Cir. 1987)). Second, the Exchange points to testimony and documents evidencing substantial advertising expenditures for, and unsolicited media coverage of, its Chairman and C.E.O., Richard Grasso. *Id.* at 4–5 (citing Adamonis Dec. ¶¶ 4,6,7–14.)

■ The Exchange is certainly correct that the foregoing constitutes probative evidence of secondary meaning. The problem is that none of it is conclusive, compelling though it may be, because advertising and media coverage do not always translate into success. *See BigStar Entertainment, Inc. v. Next Big Star, Inc.,* 105 F.Supp.2d 185, 202 (S.D.N.Y.2000) (Marrero, J.) ("Plaintiff's purported [$12 million] expenditure to promote its business may evidence an effort to establish secondary meaning, but the outlay, by itself, gives no indication of the relative success of those endeavors."); *see also Centaur Communications Ltd.,* 830 F.2d at 1224 ("Not much significance may be ascribed to such citations [to unsolicited media coverage] because it is not clear what they indicate about the relevant group of consumers.").[12]

Additionally, defendants counter with their own persuasive reasons to think that the Exchange's attempts to create secondary meaning in the Grasso name have largely failed. A key component of the Exchange's analysis is its contention that "[b]ecause there can be no parody when no one 'gets' it, the so-called parody defense here must fail." *Defs.' Opp'n Mem.* at 19 (citing *Pl.'s Mem.* at 21). The excerpts from Gahary's testimony that the Exchange cites in support of this claim leave one with the impression that his parody failed because it was inherently incomprehensible as such.[13] As defendants point out, however, the Exchange omits contiguous portions of Gahary's testimony that clarify his belief that the parody failed primarily because no one recognized who Richard Grasso was. *Defs.' Opp'n Mem.* at 19–20 (citing Gahary Tr. 134–135). Consider the following sample of surrounding testimony:

Q. So, it is your testimony, then, that in order for the parody to work, the audience has to know who Richard Grasso is?

A. Well, that would be nice, yes.

Q. And it is your testimony, also, that nobody knows who Richard Grasso is?

---

12. On an unrelated note, such evidence does tend to confirm Exchange's standing to bring suit to defend its reasonable interest in Grasso's good name. *See, e.g., MasterCard Int'l Inc. v. Sprint Communications Co.,* 1994 WL 97097, 1994 U.S. Dist. LEXIS 3398 (S.D.N.Y. March 23, 1994) (Martin, J.) (noting that Section 43(a) of the Lanham Act does not require that suit be brought by the actual owner of the name).

13. That is, the parody was incomprehensible even to those who knew that Richard Grasso is the Chairman and C.E.O. of NYSE.

A. Very few people know who Richard Grasso is.

Q. So, by your own definition, this cannot be a parody, because no one is understanding who he is?

A. Well, you have to take into account the lurkers, right, who don't post.... All I know is that if it was originally intended as a parody and if it did not meet the definitions that I just spelled out, then it did not meet the definition of parody because nobody knew who Richard Grasso was. That is not my fault. The reason is that most people are uneducated.

(Gahary Tr. 134–35.) Indeed, Gahary's testimony is unequivocal on this point: he was "shocked at how nobody knew who Richard Grasso was." (*Id.* at 109.) And while Gahary's opinion is hardly conclusive, it is consistent with what record there is of his interactions with other participants on the RagingBull.com message boards. On at least one occasion, for example, Gahary apparently became so exasperated with his readers' lack of knowledge that he devoted part of one particularly vehement response to explaining who Richard Grasso was:

> Richard Grasso is the Chairman of the NYSE; common knowledge for most investors, especially for most investors, especially the ones who don't spend every waking second posting gibberish NEARLY EVERY MINUTE, like on this farce of a board.

(Compl., Ex. 2C.) Equally telling, the Exchange can point to only one message, out of the many excerpted in both parties' papers, where someone on RagingBull.com

besides Gahary displays knowledge of Richard Grasso's connection with the Exchange.[14] This evidence, taken together, raises sufficient doubts that the issue of secondary meaning must go to trial.

*Likelihood of Confusion*

Plaintiff and defendants purport to agree that the question of the likelihood of confusion is governed by the eight-factor test articulated in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.1961). These factors are: "(1) the strength of the mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will 'bridge the gap'...; (5) actual confusion; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product; (8) the sophistication of the buyers." *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 391 (2d Cir.1995).

Unfortunately, despite insisting that prevailing Second Circuit precedent demands "deliberate review of each factor," defendants analyze none of the eight in their memorandum. *Defs.' Opp'n Mem.* at 24 (quoting *New Kayak Pool Corp. v. R. & P. Pools, Inc.*, 246 F.3d 183, 185 (2d Cir. 2001)). Plaintiff does only slightly better, discussing the various factors in a cursory fashion, and arguing that, in any event, it need only seriously analyze the three "most significant," which are: "(1) the strength of the plaintiff's mark; (2) the degree of similarity; and (3) the competitive proximity of the users." *Pl.'s Reply Mem.* at 6 (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d

---

14. A poster, who goes by the screen name "oldfuzz §§ ", writes:

> In my opinion, there is clearly something funny going on within Raging Bull–Lycos concerning this maroon. It is clear that he was using the alias of Richard Grasso and his posts clearly showed he was pretending

to be THE Richard Grasso by the comments. It is why the New York Stock Exchange IS CURRENTLY suing him.

(Statement of Uncontested Facts, Ex. C.) This message, of course, also undercuts the Exchange's claim on a different front, the likelihood of confusion, discussed below.

Cir.1987)). Since this is a motion for summary judgment, and the parties have not briefed this issue in sufficient detail, the court is reluctant to engage in any systematic analysis of the various *Polaroid* factors. However, it is still worthwhile to review certain general points, regarding the likelihood of confusion, raised by the parties in their cross-motions.

On this issue as well, the Exchange makes much of Gahary's admission that he chose the name Grasso for the express purpose of "identifying with the [New York Stock] Exchange's C.E.O." *Pl.'s Reply Mem.* at 6 (citing (Gahary Tr. 94, 95)). Yet where parody is concerned, "[i]f the context or manner of the use does not suggest that the trademark is being used to indicate source or origin of publication, there will be no consumer confusion." *Yankee Publ'g, Inc.*, 809 F.Supp. at 273. As suggested above, the Exchange fails to consider how the subversive substance of Gahary's messages, as well as his choice of place to post them, tend to undercut any presumption that he was trying to confuse readers as to the identity of the poster. More accurately, these considerations should suggest even to readers who recognize the name Richard Grasso that he is not, in fact, richardgrasso, the author of the messages being posted on Raging-Bull.com.

█ The Exchange does point to certain troubling messages in which Gahary states that he is the "original richardgrasso," (Compl., Ex. 2A), and that "there's only 1 richardgrasso on the planet." (Compl., Ex. 2H.) These posts could certainly evidence an intent to trick the reader into thinking that Richard Grasso, C.E.O. of NYSE, is somehow behind them. But they could just as easily represent Gahary's efforts to identify himself as the one and only "richardgrasso," outrageous personality on the virtual stage of the Raging-Bull.com, stock bulletin boards. Neither party has presented enough evidence for the court to say, at this moment, which reading is correct.

The foregoing points ring particularly true when one considers the many other celebrity-inspired screen names besides Richard Grasso registered on the Raging-Bull.com message boards. Defendants cite numerous examples of screen names that are clearly meant to evoke a variety of public figures, from the financial world and beyond.[15] Everyone from "Bill‗Clinton" to "bill‗gatesl" is represented, yet the court is confident that no participant on RagingBull.com would be surprised to find that neither Bill Clinton nor Bill Gates had ever posted to the site's message boards. The Exchange argues that "third-party use or infringement cannot be raised by an

---

**15.** Consider the following representative RagingBull.com aliases: "Ralph Acampora," "acampora," "MariaBartiromo," "mbartiromo," "Bartiromo," "Jeff‗Bezos," "J‗BEZOS," "J–Bezos," "JBezos‗2," "Jbezos‗3," "Jbezos‗5," "JbezosIsRetired," "Bezos‗is‗a‗fool," "IvanBoesky," "WarrenBuffett," "WarrenBuffette," "GeorgeWBush," "GeorgeBush," "dickcheney," "Bill‗Clinton," "AbbyCohen," "jim‗cramer," "cramer‗sucks," "bill‗gatesl," "billgates666," "WilliamGates," "BGates," "al‗goldman," "Goldman‗Sachs," "goldman‗sucks," "John+Gotti," "Alan Greenspan," "DrAlanGreenspan," "greenspansucks," "Greespan‗Blows," "greenspan," "Greenspan," "GREENSPAN," "greenspan2," "greenspan 3," "greenspan 4," "A‗Greenspan," "A‗GREENSPAN," "AGreenspan," "RudyGuliani," "hitler," "EFHutton," "thomasjefferson," "Steve‗Jobs," "JoeKernan," "oldabelincoln," "PeterLynch," "PeteLynch," "peterlynch," "Michael‗Milken," "MMILKEN," "mmilken," "m.milken," "JPMorgan," "jpmorgan," "jpmorgan6," "JPMorgan‗sOrgan," "danNiles," "nyse," "NYSEat2001," "MrNYSE," "nyseotc," "nysetrader," "NYSETRADER1," "NYSEFreak," "NYSEDOG," "BobPisani," "rrubin," "George‗Soros," "MarthaStewart," "DonaldTrump," "Donald‗Trump777," "DONTRUMP," "DTRUMP." (Gahary Dec., Ex. 1.)

alleged infringer as a defense or excuse." *Pl.'s Reply Mem.* at 13 (citing *Andy Warhol Enterprises, Inc. v. Time Inc.*, 700 F.Supp. 760, 764 (S.D.N.Y.1988))(Whol Kram, J.). Though true, this hardly means that the existence of other celebrity screen names is therefore irrelevant. The argument here is not that use by others has somehow diluted the strength of the Grasso name. *See Id.* It is rather that the prevalence of a wide variety of famous screen names on RagingBull.com provides important context in evaluating whether a reasonable reader would be likely to confuse Richard Grasso as the true author of Gahary's offensive posts.

The Exchange is certainly correct that many legitimate questions remain about these other celebrity aliases. Are they really valid screen names on Raging-Bull.com? The submissions by defendants tend to suggest they are, but the Exchange is obviously free to present evidence to the contrary. How widespread is their use? The more participants there are on RagingBull.com who use such celebrity screen names, the less likely readers should be to confuse the author of a message posted under a famous alias. But issues like these are best resolved at trial, after the parties have had a full opportunity to present their evidence.

Finally, on this issue of the likelihood of confusion, the court notes that the Exchange has not offered, in its submissions, any clear evidence of actual confusion. Instead, the Exchange asks the court to draw inferences based upon, among other things, Gahary's decision to explain, in one particularly vehement reply, that Richard Grasso is the Chairman and C.E.O. of NYSE. As the Exchange puts it: "Why explain when there's no confusion?" *Pl.'s Reply Mem.* at 8. Gahary's heated retort is indeed evidence of reader confusion, just not the sort relevant to a claim under the Lanham Act. It suggests that readers

were perplexed about the identity of the author of the posts because they had no idea whatsoever who Richard Grasso was.

However, trademark law is primarily concerned with a different scenario, one in which readers who do recognize the name Richard Grasso are confused into thinking that he is the source of the offensive messages being posted to RagingBull.com. Recognition, in other words, is a prerequisite for the kind confusion relevant to this case. If no one has any idea who Richard Grasso is, Gahary cannot be accused of trying to free-ride on the former's name. And it is telling that, in the only response where a reader explicitly draws the connection between Grasso and the Exchange, there is no confusion whatsoever that the former might be the author of Gahary's offensive posts. *See supra* n. 14. The Exchange, of course, is by no means obligated to prove actual confusion to prevail on its claims. *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir.1986). However, given that this motion is for summary judgment, such proof would have greatly strengthened the Exchange's position.

*First Amendment/Parody Defense*

This issue is critical to resolution of this case since a successful First Amendment claim by defendants would defeat the Exchange's state and federal claims alike. The Second Circuit has long recognized that "the First Amendment confers a measure of protection for the unauthorized use of trademarks when that use is a part of the expression of a communicative message." *Yankee Publ'g, Inc.*, 809 F.Supp. at 276. Where a defendant presents a defense of parody, the "relevant inquiry is 'whether a parodic character may be reasonably perceived.'" *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 113 (2d Cir.1998) (quoting *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 582, 114

S.Ct. 1164, 127 L.Ed.2d 500 (1994)). As discussed above, the Exchange makes much of Gahary's testimony that "no one 'gets' his parody," reasoning that "[i]f no one 'gets' Mr. Gahary's alleged parodic message, that message is simply not reasonably perceived and, therefore, is not a parody." *Pl.'s Reply Mem.* at 9. Though this analysis has a certain prime facie appeal, it cannot withstand closer scrutiny.

■ For one thing, the law is clear that "First Amendment protections do not apply only to those who speak clearly, whose jokes are funny, and whose parodies succeed." *Yankee Publ'g, Inc.*, 809 F.Supp. at 280. *See also Campbell*, 510 U.S. at 578, 114 S.Ct. 1164 (citing *Yankee* with approval). In fact, the United States Supreme Court has long cautioned judges against the temptation to act too readily as arbiters of taste or effectiveness where expression such as parody is concerned. *See e.g., Campbell*, 510 U.S. at 578, 114 S.Ct. 1164; *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251, 23 S.Ct. 298, 47 L.Ed. 460 (1903). The reason, as Justice Holmes explained, is that "[a]t one extreme some works of genius would be sure to miss appreciation. Their very novelty would make them repulsive until the public had learned the new language in which their author spoke." *Bleistein*, 188 U.S. at 251, 23 S.Ct. 298. The court is thus disinclined to second guess Gahary's claim of parody, at least on a motion for summary judgment, where defendants are entitled to have doubts resolved in their favor.

Even more fundamentally, as suggested at various points throughout this opinion, the Exchange fails to adequately address the question of why precisely Gahary's parody failed. The Exchange essentially asks the court to presume that this failure resulted because Gahary's parody was utterly incomprehensible as such. Gahary, of course, insists he was unsuccessful because too few of his readers recognized who Richard Grasso was. (Gahary Tr. 134–35.) Gahary's characterization is by no means dispositive, but it is consistent with what evidence there is on the record—familiar points that nonetheless bear repeating. As stated before, the defining feature of a parody is that it simultaneously conveys two contradictory messages: "that it is the original, but also that it is not the original and is instead a parody." *Cliff's Notes, Inc.*, 886 F.2d at 494. And when one is aware of Richard Grasso's identity, two such conflicting messages do seem to be discernible. Each of the eight screen names at issue evokes Richard Grasso, prominent financial figure, while the outrageous messages posted under these names suggest that the true author is anyone but Grasso.

The Exchange argues that use of an identical mark cannot constitute parody, and distinguishes the cases cited by defendants on grounds that they all involve "imitation" (which is permissible), as opposed to defendants' act of "duplication" (which is not). *Pl.'s Reply Mem.* at 9–10. This argument is flawed for at least two reasons. To begin with, it is not at all clear that defendants simply duplicated the name Richard Grasso. Although the screen names created by defendants were all very similar to, and clearly meant to evoke, the Grasso name, none of them was literally identical to "Richard Grasso."[16] Moreover, the Exchange's analysis simply cannot be correct where parody of famous figures is concerned. Such parodies routinely use the full names of prominent public personalities as part of their humorous message. Yet no one could seriously

---

16. This is particularly true in the context of the internet, where the difference of single character or space is often all that separates completely distinct screen names. *See supra*, n. 409.

suggest that the targets of these parodies therefore have a claim for trademark infringement.[17] Once again, the key question in the parody context is whether the speaker has created confusion by identifying the famous party as the actual source of the message, as opposed to simply the target of the parody. And on that issue, defendants have raised enough questions to justify denying the Exchange's motion for summary judgment.

Finally, the court notes that even if Gahary's use of the Grasso name does not qualify as parody, per se, it may still be entitled to First Amendment protection regardless. So long as a party's "unauthorized use of another's mark is part of a communicative message and not a source identifier, the First Amendment is implicated in opposition to the trademark right." *Yankee Publ'g, Inc.*, 809 F.Supp. at 276. This principle applies with equal force across the entire spectrum of protected speech:

> [T]he Second Circuit has construed the Lanham Act narrowly when the unauthorized use of trademark is for the purpose of a communicative message, rather than identification of product origin. Thus, where the unauthorized use of a trademark for expressive purposes of comedy, parody, allusion, criticism, news reporting and commentary, the law requires a balancing of the rights of the trademark owner against the interests of free speech.

*Id.* (citing *Rogers v. Grimaldi*, 875 F.2d 994, 998 (2d Cir.1989); *Cliffs Notes, Inc.*, 886 F.2d at 493–95). Gahary has testified that he cultivated an exaggerated on-line persona, richardgrasso, in an effort to mock the " 'ego inflated windbags' [who] would come to puff out their chest feathers and ruffle those of their 'adversaries' " on RagingBull.com. *Defs.' Opp'n Mem.* at 29. In other words, his extreme and outrageous postings were also intended as satire of the empty and obnoxious posturing of participants in RagingBull.com's stock discussion boards. Thus, even if Gahary's messages do not meet the technical definition of parody, they may still qualify as other expression entitled to similar First Amendment protection. *See Yankee Publ'g, Inc.*, 809 F.Supp. at 279 ("The message of these cases is not merely that parody is accorded First Amendment deference, but rather that use of a trademark in the communication of an expressive message is accorded such deference.")

### Defendant Zito's Liability

The Exchange argues that Zito's liability is clearly established because the latter has conceded that "he *used* the Grasso name without authority from Richard Grasso." *Pl.'s Reply Mem.* at 14. The basis for this contention is Zito's admission "that at defendant Gahary's request, he [Zito] established accounts at 'RagingBull.com' for three screenames [sic]: 'richardgrasso3', 'richardgrasso4' and 'richiegrass' and shared the password for those names with defendant Gahary." (Zito Answer and Countercls. ¶ 17).

The court is frankly skeptical that the mere act of procuring Grasso aliases, as distinct from posting under them, rises to the level of "use in commerce," as contemplated by the Lanham Act. *Cf. Cline v. 1–888–Plumbing Group, Inc.*, 146 F.Supp.2d 351 (S.D.N.Y.2001) (Ward, J.) ("In the con-

---

**17.** Under the Exchange's theory, for example, the First Amendment would protect Hustler Magazine's infamous parody of Jerry Falwell from a suit for intentional infliction of emotional distress, but not one for trademark infringement. *See Hustler Magazine v. Fal-well*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). Such a result, while not technically inconsistent with the holding in *Hustler*, would seem to be at odds with the principles articulated in that case.

text of internet domain names, parties encroach on a registrant's rights under § 32(1) of the Lanham Act not when they reserve a domain name likely to be confused with the registered mark, but when they use it."); *Planned Parenthood Fed'n of Am. Inc. v. Bucci,* 1997 WL 133313, 1997 U.S. Dist. LEXIS 3338 (S.D.N.Y. March 24, 1997) (Wood, J.), *aff'd,* 152 F.3d 920 (2d Cir.1998); *Hard Rock Cafe Int'l (USA) Inc. v. Morton,* 1999 WL 701388, 1999 U.S. Dist. LEXIS 13760 (S.D.N.Y. Sept. 9, 1999) (Patterson, J.); *Panavision International, L.P. v. Toeppen,* 945 F.Supp. 1296, 1303 (C.D.Cal.1996) ("Registration of a trademark as a domain name, without more, is not a commercial use of the trademark and therefore is not within the prohibitions of the Act.").

■ However, even if Zito did not technically use the Grasso name, he is still potentially liable under a theory of contributory infringement. This occurs when one party supplies another with the means (e.g., product, labels, advertising) by which the other is able to infringe. *See Polymer Tech. Corp. v. Mimran,* 975 F.2d 58 (2d Cir.1992); *Display Producers, Inc. v. Shulton, Inc.,* 525 F.Supp. 631, 633 (S.D.N.Y.1981) (Owen, J.) ("Courts have uniformly recognized that a person can be liable under the Lanham Act even though that person was not directly responsible for placing the infringing goods in commerce."). In this case, Zito does not deny that he created additional Grasso aliases knowing that Gahary would then post messages under those screen names. (Zito Dec. ¶¶ 5–7). Therefore, to the extent that Gahary is himself guilty of trademark infringement, Zito can be found vicariously liable for the same.

### Defendants' Counterclaims

Defendants interpose counterclaims against the Exchange for harassment and abuse of process. The Exchange argues that it is entitled to judgment on the pleadings regarding both claims. Since this motion was made after the close of pleadings, it is properly termed a motion for judgment on the pleadings, pursuant to Rule 12(c), Fed.R.Civ.P., rather than a motion for failure to state a claim, pursuant to Rule 12(b)(6), Fed.R.Civ.P. *See Patel v. Contemporary Classics of Beverly Hills,* 259 F.3d 123, 126 (2d Cir.2001). No matter what the court calls it, however, the applicable standard remains the same: "the district court must accept all allegations contained in the complaint as true and draw all inferences in the non-moving party's favor." *Id.* Furthermore, "the court should not dismiss the complaint unless it is satisfied that the complaint cannot state any set of facts that would entitle him to relief." *Id.*

■ Defendants' first counterclaim, for harassment, is easily disposed of since "New York law does not recognize any independent tort for harassment." *Jones v. Trump,* 1997 WL 277375, at *9 n. 5, 1997 U.S. Dist. LEXIS 7324, at *11 n. 5 (S.D.N.Y. May 27, 1997) (Schiendlin, J.) (interpreting a harassment claim as one for intentional infliction of emotional distress, and dismissing pursuant to 12(b)(6)). *See also Couch v. Schmidt,* 204 A.D.2d 951, 612 N.Y.S.2d 511, 513 (N.Y.App.Div.1994) (dismissing defendant's counterclaim for harassment because it "is an attempt to make a hybrid claim with some, but not all of the necessary elements of abuse of process, malicious prosecution and intentional infliction of emotional harm"). Defendants improperly seek to create their own hybrid cause of action, and they do not even begin to analyze the possible alternative causes of action, such as intentional infliction of emotional distress. Thus, judgment for the Exchange on the pleadings is appropriate with respect to this counterclaim.

■ Defendants' second counterclaim is more difficult to dismiss, but only slightly so. To prevail on a New York common law claim for abuse of process, a party must allege "three essential elements: (1) regularly issued process, either civil or criminal; (2) an intent to do harm without excuse or justification; and (3) use of process in a perverted manner to obtain a collateral objective." *Curiano v. Suozzi,* 63 N.Y.2d 113, 116, 480 N.Y.S.2d 466, 469 N.E.2d 1324 (N.Y.1984). Defendants, however, neither can nor do make prime facie showings concerning these three elements. As to the first and third, mere "institution of a civil action by summons and complaint is not legally considered process capable of being abused." *Id.* See also *P.S.I. Metals, Inc. v. Firemen's Ins. Co. of Newark, New Jersey,* 839 F.2d 42, 44 (2d Cir.1988). Since that is the only process cited by defendants as abusive in this case, their showing as to elements two and three must be deemed insufficient as a matter of law.

Regarding the second element, defendants rely exclusively upon vague and conclusory allegations that the Exchange brought suit out of a "desire to harass and silence" them. (Gahary Answer and Counterclaims ¶ 66); *see also* (Zito Answer and Counterclaims ¶ 70.). Defendants apparently believe that the Exchange's complaint and memoranda are so obviously unjustified as to speak for themselves. The court could not disagree more. Though the Exchange has not offered enough proof to justify summary judgment, its submissions certainly do not evidence any bad faith or other malicious intent. That the Exchange may ultimately fail to prevail on its claims is immaterial; the court fully comprehends why the former felt compelled to bring suit in the first place. The Exchange was reasonably concerned that Gahary's highly offensive messages would threaten their substantial investment in the good name of Richard Grasso. Even when the record is construed to favor defendants, the worst that can be said about the Exchange is that it overestimated the strength of its claims somewhat. Such behavior does not rise to the level of an illegitimate intent to do harm. Therefore, the court finds that the Exchange is entitled to judgment on the pleadings with respect to defendants' second counterclaim as well.

## CONCLUSION

In the final analysis, both sides have presented enough evidence to make summary judgment inappropriate in this case. Significant questions remain regarding Gahary's intent, the success (or lack thereof) of the Exchange's efforts to cultivate a secondary meaning associated with the Grasso name, the likelihood of confusion, and defendants' First Amendment claims. However, defendants do not, and the court is convinced they cannot, allege facts sufficient to constitute even a prime facie case for either of their counterclaims. As to defendants counterclaims of harassment and abuse of process, therefore, the court grants the Exchange judgment on the pleadings.

Accordingly, the Exchange's claims against defendants are set down for trial as the fourth case in the court's trial term, which begins on April 16, 2002. Since no precise date can be set at this time, the parties are advised to watch the *New York Law Journal* for the conclusion of the third case, *Aslan Tatar and Selma Onel v. Elite Gold, Inc.,* 01 Civ 2433(RLC). This case will be called for trial 24 hours thereafter.

**IT IS SO ORDERED.**